**LAWS v. PARKER PETROLEUM CO.**

No. 9946.

Court of Civil Appeals of Texas. Austin.
Feb. 21, 1951.

Rehearing Denied March 14, 1951.

Barkley, Pardue & Tigner, Stanley C. Woods, K. C. Barkley and Stanley C. Woods, all of Houston, Aubrey H. Fielder, Lockhart, for appellant.

Small & Small, C. C. Small, Jr., Austin, for appellee.

HUGHES, Justice.

Preston Laws, appellant, and Parker Petroleum Company, appellee, entered into a written contract by the terms of which appellant agreed to drill a well for oil and gas in Caldwell County to a depth of 2200 feet, unless appellee directed that drilling cease at a lesser depth. After drilling to 2104 feet a cavity of some sort was encountered, difficulties arose, arguments ensued, and the well was never completed.

Appellant sued to recover the contract price of $2.25 per foot for the number of feet actually drilled, alleging that his failure to complete the well to the contract depth was because of appellee's breach of the provision in the contract requiring it to "furnish the mud weighting material at company's expense if and when same is found necessary."

Reasonable attorney's fees under Art. 2226, Vernon's Ann.Civ.St., were also sought.

Appellee answered this suit by admitting the execution of the drilling contract and

the drilling of the well to 2107 feet, and alleging that appellant abandoned the well at that depth and moved his equipment from the lease. It was further alleged that as a consequence of appellant's refusal to complete the well as agreed that "a dispute arose between plaintiff (appellant) and defendant (appellee) as to the liability, if any, of defendant for the partially completed work performed by plaintiff prior to his abandonment of said well and the liability, if any, of plaintiff for his failure to drill and complete said well as required by the terms of said contract * * *," and that as a result of this dispute an accord and satisfaction was effected by the payment of $913.50 to appellant and his execution of the following release:

"Luling, Texas,
"August 31, 1949.
"Received of Parker Petroleum Company Nine Hundred & Thirteen And 50/100 Dollars (913.50) in cash, being payment in full and final settlement of any and all claims and demands account of that certain drilling contract entered into between Preston Laws and Parker Petroleum Company, dated August 15th, 1949; which said Drilling Contract provided for drilling the #3 well on the Robert Malone et al lease in Caldwell County, Texas.

"/S/ Preston Laws
Preston Laws."

The answer also contained a general denial.

Trial by the court resulted in a judgment for appellee. It is worthy of note that this judgment did not contain the usual recitation that "the law and the *facts* are with defendant" but only recited that "the *law* of this case is with the defendant."

Findings of fact and conclusions of law were not requested and were not filed.

Appellant's three points question the efficacy of the release executed by him to discharge appellee's obligations under the contract.

Appellee has two counter points, the second of which asserts that since there was a

bona fide dispute concerning a breach, vel non, of the contract and the respective liabilities, if any, of the parties thereunder, the release executed by appellant constituted a valid accord and satisfaction.

Appellee's first counter point is that in support of the judgment it must be presumed that the court found adversely to appellant on all issues relating to his action for breach of contract.

The argument under this point is unattended by any facts and in order to pass upon this question we have had to read the 242-page statement of facts.[1] We will state the material facts and evidence.

Saturday, Sunday, Monday, Tuesday and Wednesday hereafter mentioned are August 27, 28, 29, 30 and 31, 1949.

The contract contained these material provisions:

"Contractor[2] agrees that operations for the drilling of said well shall be commenced on or before August 20, 1949; and that the drilling operation shall be continued with the due diligence to completion as hereinafter provided, that said well shall be drilled in a thorough and work-man like manner, with a hole for surface casing 15 inches in diameter and the balance of the hole a minimum of 8-¾" in diameter; to a depth of 2200 feet, or to such lesser depth at which Company shall select to abandon the well or to set an oil string and complete the well as a producing well. * * *.

"Contractor shall take cores, drill reduced hole, make drill stem tests and electrical log or other surveys at such points and time as Company may designate; shall set liner and/or test at any depth, when requested by and in a manner acceptable to Company. Coring and testing, shall be paid for by Company at the hourly rate hereinafter specified, except that no extra charge or rig time shall be made by Contractor while electrical or gamma ray log is being run, while surface cement is setting, or while any casing cement is setting. Service charges made by

1. This method of briefing is not in accord with Rules 419–420, Texas Rules of Civil Procedure.

2. Contractor is appellant and Company is appellee.

Service Companies for electrical logs, drill stem testing and cementing will be paid by Company.

\*   \*   \*   \*   \*   \*.

"Contractor shall maintain the kind, nature, weight, viscosity, water loss, and other carasteristics and properties of the mud in the condition required by Company or its representatives at any and all times, it being understood, however, that Company shall furnish the mud weighting material at Company's expense, if and when same is found necessary;

\*   \*   \*   \*   \*   \*

"(b) For the drilling, completion or abandonment of said well, and the performance of all acts, duties and operations herein specified to be done, made and performed by Contractor, other than work herein expressly stipulated to be hourly work, Contractor shall receive $2.25 per foot. Any hole made by the Contractor, at Company's request, below 2200 feet depth, will be on the basis of $15.00 per hour. It is understood and agreed that any hourly work done at the request of Company will be on the basis of $15.00 per hour.

"(c) It is understood and agreed that no rig time costs will accumulate while either the surface casing cement is setting or while any other casing cement is setting.

"Any circulating for samples, at Company's request, will be paid for by Company on the hourly basis set out herein, but it is expressly understood and agreed that any other circulating, including that done to condition the hole, will be at the Contractor's sole cost and expense.

"(d) $500.00 shall be paid by Company to Contractor when the surface casing is set; said $500.00 to be deducted from the total consideration when Contractor is finally paid for completed well.

"The balance of the contract price to be paid by Company to Contractor when the well is completed; it being understood and agreed that the final consideration will be computed on the basis set out above for the actual footage drilled up to the completion or abandonment of the well."

The well was being drilled with a rotary drilling rig.

When, in reaching 2104 feet, 96 feet short of the contract depth, the bit entered a cavity or crevice with the result that "loss of circulation" and "loss of returns" occurred. This was on Saturday. Appellant thereupon notified appellee's representative, Mr. Lloyd Parker, and after a short delay Mr. Parker demanded that a testing tool be run. The following conversation occurred between appellant and Mr. Parker:

"Q. What did you find taking place when you reached the well after having taken your family home? A. They were preparing to come out of the hole to run a testing tool.

"Q. Did you object to them running a testing tool? A. I certainly did.

"Q. Who did you object to? A. Lloyd Parker.

"Q. What did Mr. Lloyd Parker say? A. He said under the contract I would have to run a testing tool any time I was required to or forfeit the contract.

"Q. What did you tell Mr. Parker if you pulled the drilling pipe out of the hole what would happen? A. I told him that the hole would be in bad shape.

"Q. What did he then say? A. He still demanded that I pull out of the hole and run a testing tool.

"Q. What did you say? A. I told him under the same contract it did not say I had to run my drilling pipe back in the hole without being able to get returns.

"Q. Then what happened? A. Then he decided to get a string of tubing that belonged to the Parker Petroleum Company and run the testing tool on the tubing, if I wouldn't run my drilling pipe back in the hole.

"Q. They then did bring the tubing? A. Yes."

The test was made but was unsuccessful, the tool could not be lowered below 1800 feet. When asked what the testing tool did to the hole, appellant answered, "tore the wall of it down as it went in and came out."

Mr. Russell Clymer, a production superintendent for the Magnolia Petroleum Company, a witness for appellee, testified:

"Q. When you lose circulation is it the usual and customary thing to take a drill stem test? A. No, not until you restore circulation.

"Q. You have to restore circulation? A. That is right.

"Q. What effect would it have to take a drill stem test? A. You might stick the pipe then you couldn't tell whether your pipe was holding or not. You got to have your hole full before you could tell what you are doing.

Since this testing was done at appellee's request it is known as "rig time" and was due to be compensated for by appellee at the rate of $15 per hour under the provision of the contract above set out. At least 27 hours was consumed in this operation, including the time necessary for appellant to again reach the bottom of the hole,[3] and this is the number of hours which appellant charged as "rig time."

After the testing tool was removed from the hole appellant began mixing "mud" which he had hauled from a Magnolia warehouse and from Haliburton in Luling.[4] A "mud engineer" furnished by appellee directed these operations which were successful. The crevice was sealed off, circulation recovered and drilling resumed. This continued for thirty or forty minutes and some hole was made before circulation was again lost. The following conversation then ensued between appellant and Mr. Lloyd Parker as testified to by appellant:

"Q. Then what happened after you lost returns the second time? A. I told Lloyd whatever the mud engineer, their mud engineer, not mine, required we run in this hole, I would be willing to run, whatever mud specifications he said would suit me, because he—supposed to be a specialist.

"Q. Then what took place? A. He made a recommendation as to what mud to get and said he could order it out of Victoria by truck and have it out there in not over two or three hours.

"Q. It didn't take more than two or three hours? A. Yes.

"Q. How much mud? A. The truck, I don't know how much they did put on it, but the way he talked, he would order out a truck, and they were to buy what they used, only pay for what they brought out and used.

"Q. What did Mr. Parker do? A. He didn't buy it.

"Q. How much mud was there at the location at that time? A. I don't know, maybe ten or fifteen sacks of Howcojel, that is Haliburton mud, and a few sacks of Jell Flakes, I don't remember how many, but only six or eight sacks of Jell Flakes, maybe ten.

"Q. What was said about using the mud that was on the location? A. The engineer said that wouldn't be sufficient quantity to try to get returns the second time.

"Q. It wasn't sufficient to get returns a second time or at this time; you lost returns for the second time, and you did not have the mud quantities there at that time to continue drilling operations? A. No, sir, I did not.

"Q. And Mr. Parker told you that he woud not get any mud? A. He just didn't get any.

"Q. He didn't get it? A. No.

"Q. What did he say when the mud man told him he would have to have a truck load of mud to continue drilling? A. Costs lots of money.

"Q. Did he say anything else? A. He just didn't get me anything to pump in the well.

"Q. What happened then? A. Well, the pipe, when I lost returns the second time, the pipe was sticking.

"Q. What do you mean the pipe was sticking? A. The hole was falling in so fast if I didn't have mud there immediately, I would be forced to pull the pipe.

"Q. Because—A. If I hadn't pulled it, it would probably stick and I couldn't pull it at all.

"Q. What did you do? What were your actions at that time? A. I asked for more mud.

3. Mr. Lloyd Parker estimated this time at 48 hours.

4. A drayage charge of $8.50 was made for this hauling.

"Q. Whom did you ask? A. I asked Lloyd.

"Q. What did he say? A. He didn't buy me any.

"Q. He would not buy you any? A. No.

"Q. What did he say about doing with the mud that was there on the ground? A. He said not to use the jell flakes that were there because he wanted to return it to the Magnolia Company, it was too high to use.

"Q. It was too high? A. Yes.

"Q. All the time the mud man recommended what? A. He recommended more of the same thing that I had gotten returns with the first time.

"Q. What was that? A. That was Jell Flakes.

"Q. What was that? A. That was Jell Flakes and Howcojel mixed. The first time we used Howcojel and Jell Flakes mixed and got returns with it.

"Q. Then you were at that time never furnished sufficient mud quantities to continue drilling? A. I was not."

With reference to this same matter Mr. Lloyd Parker testified that after circulation was lost the second time he went to see Mr. Clymer of the Magnolia Company and he suggested the use of cement. Mr. Parker was asked: "Then when Laws had mixed up one batch of mud to his own satisfaction and lost returns at 2,070 feet, another batch of mud had been mixed up according to the recommendation of the Homco mud engineer and circulation regained and drilling commenced, but again circulation was lost; what was your recommendation to Mr. Laws as the next thing to do?

And his answer was: "I told him we had tried mud and Jell Flakes twice without any success and I told him of Magnolia's experience in cementing off the crevice. Going back when we first lost circulation, I went and talked to Mr. Clymer, and when we found out about the cement, we hauled out to the location 75 sacks of cement. I instructed Mr. Laws to cement the crevice or cavity off and he didn't want to do it. Monday after we had lost circulation twice more, after mixing mud and Jell Flakes, I asked Mr. Laws, I told him we would bring some cotton seed hulls to the location maybe that would work, the Jell Flakes had not worked. He said he didn't want to pump the cotton seed hulls. I asked him why. He said it would mess up his mud, he would have to strain it out before he could drill ahead. So I asked him specifically if we would bring cotton seed hulls out there whether or not he would refuse to pump them. He said, 'That is right, I am not going to pump them,' so therefore we did not haul any cotton seed hulls out there.

"Q. What was his attitude when you asked him to run cement? A. He just wouldn't even consider it. I even offered to lend him well tubing to run that cement. He said he wouldn't endanger his drill pipe. Of course we would have pumped it with a Haliburton truck, just be using his derrick and draw works and equipment above ground, but he refused to do it.

"Q. Did you offer him help if he would run the cotton seed hulls? A. I offered we would get Haliburton's truck and pump hulls if he wouldn't pump them."

Again he testified: "We had some mud and some loss of circulation materials on location at all times. After he had lost returns the second time, after he had mixed up Jell Flakes, he requested, I forget the amount, some unreasonable amount of Jell Flakes. We did not make that available to him because I told him we tried that twice and didn't work, and let's try something else.

"Q. Was it your best judgment, the proper thing to do is to try another procedure after the failure of the mud? A. Yes, sir.

    *    *    *    *    *    *

"* * * We were trying to get him to run cotton seed hulls or cement, and he wouldn't do anything.

    *    *    *    *    *    *

"Q. When you asked him to run hulls and cement and so forth, did you offer to pay him additionally for that? A. No.

    *    *    *    *    *    *

"Q. Did you at any time direct Laws not to put mud in that hole? A. After losing circulation twice with Jell Flakes of course that isn't mud, that is loss of circulation material, I requested him not to use that any more. We had tried that twice, and it hadn't worked so we had to do something else.

"Q. Did you offer to furnish him any mud at any time to fill this supposed crevice? A. I did furnish him mud twice, or rather we did.

"Q. You furnished it twice; why didn't you continue to furnish mud? A. Because it wasn't doing any good.

\* \* \* \* \* \*

"Q. I believe you stated yesterday that Laws' demand for mud was unreasonable? A. That was after he had lost circulation the second time.

"Q. You have now stated you did not know the size of the crevice, and you did not know how much mud it would take; how do you base your conclusion that his demand was unreasonable? A. In the first place you had no assurance that just mud would stop the crevice. We had tried it twice and had lost circulation two times. Therefore we found that the mud did not stop the crevice. That is why we did not want to put any more of this straight mud in. We wanted to put some loss of circulation material, something that would have cotton seed hulls in it."

Regarding the best methods of restoring lost circulation in a drilling oil well, the following evidence of Mr. R. V. Muckelroy, a lifelong driller, was offered by appellee:

"Q. Have you had any experience— what did you use to overcome what trouble you had with loss of circulation? A. We used Baroid more up here, used whatever he tells us to use. He tells us what we should use. We order it and he would send it out. He would instruct the boys how to mix it, how to use it. All the names of the different muds and different things, I wouldn't know all of it. We used Jell Flakes, was one thing, I know we used to stop loss of circulation, and different things that we mixed.

"Q. Have you ever used a substance like cotton seed hulls? A. Never did.

"Q. Have you ever used cement to overcome it? A. No.

\* \* \* \* \* \*

"A. Yes, I drilled a well on the Hardeman.

"Q. Did you have any circulation problems? A. One well on the Hardeman, that was on the E. J. Hardeman that we put several tons of prairie hay, several tons of river moss, just everything we could get to put in there. We wound up by getting circulation with feed sacks chopped up into a pulp. That was way back in the early days of the old Luling Field when we didn't have the mud services that we have now.

"Q. But those things were successful? A. Only the feed sacks was the only thing we had success with there. We stopped the loss of circulation right there.

\* \* \* \* \* \*

"Q. When you lose circulation, you testified what you did; what is the common practice? A. Just like I told the other gentleman we call on Baroid and they sent a man out.

"Q. What is the common practice among other operators? A. When they lose circulation?

"Q. Yes, sir, when they lose circulation do they use mud, they call a mud engineer and get commercial mud? A. That is about all I know of. As I said, I have heard of using cotton seed hulls, but never used any of it. I have heard of people using it, but we always use the Baroid service. They come up and tell us what to use.

"Q. If you had had the mud service back in the early days, when you used the tons of hay and feed sacks, you probably would have used that? A. Absolutely, we didn't have that service in those days."

Early Tuesday morning Mr. J. L. Parker, president of appellee company, and his son, Mr. Lloyd Parker, met appellant and his brother on the highway between Lockhart and the well and discussed their troubles. The Parkers made appellant two proposals:

(1) to run 7-inch casing and set it at 2050 feet, upon the completion of which appellant would be paid the contract price for 2050 feet and the contract would be terminated. (2) To accept $905 in full settlement of his claims under the contract.

Appellant accepted the first proposal and appellee had a contract drawn accordingly, but this was never executed.

Wednesday morning appellant called Mr. Lloyd Parker, who testified to the following conversation: "The next thing I heard from him, Wednesday morning, August 31, he called me from Creedmore, Texas, and he said I am not going to run the 7-inch pipe. I said why. He said I have already lost so much money around that well, I am not going to take a chance on losing any more money. I said well you agreed to and it is on the way and it will be on the location this morning. He said, I am not going to run it. He said will you pay me for the compromise amount that was agreed on? He stated on the road. I said all right, we will pay that if you will move off and we will forget it. He said also there is a trucking charge of $8.50 where you hired me to move mud to the location with my truck. I said, all right, we will pay that. That makes $913.50. He said he wanted the money in cash, that the boys on the rig are crowding me; I need the money to pay them off today. So I wrote out a check for that amount and had Mr. Glass take it out to him in cash, after he had signed the receipt."

Bearing on the $905 figure and what items went into it, we quote the following evidence:

Mr. J. L. Parker:

"The money end was a compromise that we had figured up to amount to $905. The basis of it was the contract itself. It provided we would advance $500 when he set surface casing. I believe that was the basis of it. From then on it was the amount of money that would satisfy Mr. Laws.

"Q. How did you arrive at this $413.50? A. I never did arrive at $413.50 that day. The full settlement was $905.00. The $8 item came in the following morning, the amount of trucking charge we owed Mr. Laws as I understood it for hauling mud.

"Q. That leaves the sum of $405 unaccounted for; how did you arrive at that? A. It was in a general discussion between him and us as to the amount, an arbitrary amount that would satisfy him.

"Q. You say it was an arbitrary amount? A. That is correct.

"Q. Just what do you mean? A. Whether it was $300 or $1,000 or $800, we arrived at that figure.

"Q. Did Mr. Laws tell you at that time that he wanted the $500 as provided for under the contract for setting surface pipe; and $405 is rig time? A. I wouldn't say he did or not.

"Q. But you don't know? A. All that came in this adjusted settlement.

"Q. But you don't know for sure whether he said that the $405 represented rig time, is that right? A. He might have, I don't know. He could have said it, yes, sir."

Mr. Lloyd Parker, after testifying that on Monday night he had refused appellant's demand for the $500 payment provided in the contract to be made when surface casing was set, continued:

"Q. In other words, the $500 represented setting the surface pipe, $405 was regular time, and $8.50 was for hauling? A. No, sir, we just picked out an arbitrary figure.

"Q. Didn't you just tell me that $500 was for setting surface pipe? A. No, sir; what I intended to say was there was actually no discussion between Laws and ourselves as to a certain amount of regular time was $500.00. That wasn't segregated and talked about definitely until this morning we met him on the road. We figured up in our own minds this amount. We based it in our own minds, on the $500 which we did not know for sure we owed him. Then what additional time as rig time, that would be adequate time to cover his time. Laws had always wanted, he wanted more than that. He wanted for the footage drilled and we refused to do it."

Mr. S. C. Glass, appellee's witness, testified:

"Q. After that discussion that night, when was the next time you heard from Preston Laws? A. He called me over the telephone and I don't remember it was that night or the next night and told me that he had agreed with the Parkers to pay him $913.50, I believe for setting surface casing and rig time, and he told me he would not accept a check, besides he had his men out there and he wanted cash."

About 23 hours after the last shut down appellant dismantled his equipment and moved off the lease. During this period a full crew stood idly by at appellant's expense. . .

Considering first the points relating to an accord and satisfaction we will briefly state some of the well established rules pertaining thereto.

■ An accord is an agreement for the discharge of an obligation. The execution of this agreement is a satisfaction. Such an agreement must be based upon a valid consideration. The settlement of a claim, liquidated or unliquidated, which has been disputed in good faith is of itself sufficient consideration to support the agreement. 1 Tex.Jur., pp. 245, 271.

■ The payment of an undisputed item, which is fully liquidated and admittedly due and owing, will not constitute a consideration for the release of a disputed item between the same parties. Woodmen of the World Life Ins. Soc. v. Smauley, Tex.Civ. App., 153 S.W.2d 608 (Eastland) and authorities therein cited; Woodmen of the World Life Ins. Soc. v. Armstrong, Tex. Civ.App., 170 S.W.2d 526 (Dallas Writ Ref. W. O. M.).

We will apply these principles to the facts.

■ The amount received by appellant for execution of the release was the odd figure of $913.50. The Parkers in their testimony say in some instances that this figure was an arbitrary amount agreed upon as settlement of all liability under the contract. We believe, however, that their testimony as a whole and the testimony of appellee's witness Glass refute this. It is our opinion that the undisputed evidence

shows that the $913.50 was made up of these three items: $500 overdue appellant since surface casing was set, $405 for rig time, and $8.50 for hauling.

The $8.50 for hauling was undisputed. There is no question of appellee's liability for "rig time" under the contract. Statements that there was no liability did not constitute a good faith dispute. There may have been a bona fide dispute concerning the extent of this liability but if so the accord extended to that item and no further. Buchanan & Carvel v. Etie, Tex.Civ.App., 191 S.W.2d 7061 (San Antonio Writ Ref. N. R. E.).

The $500 item was liquidated and due and while it was a credit against the total consideration payable under the contract, it should have been paid in accordance with its provisions and certainly should have been paid when demanded by appellant. Appellee's right to recover this $500 in the event appellant subsequently breached the contract is an entirely different matter. No release of this right has been made by appellee.

■ Our conclusion is that the release executed by appellant constitutes no bar to his suit for recovery upon the contract for compensation for the footage actually drilled.

This holding brings us to a consideration of appellee's first counter point.

In the absence of findings of fact and conclusions of law we have had considerable difficulty in determining upon what theory the trial court acted in rendering judgment for appellee. Appellant makes the statement in his brief that there is only one law question in this law suit and this is: "Does the payment of a liquidated demand release the debtor from the payment of another independent and liquidated claim?" And his points are all related to this question. Appellee does not deny this statement point blank, although he does make the point that in favor of the judgment it must be presumed all fact issues were found against appellant.

We do not believe this judgment was intended to have such effect. It was limited to a legal conclusion that the law was

against appellant; the facts were not mentioned. Furthermore, in our opinion, the evidence supporting appellant's claim that appellee breached the contract in failing to furnish mud weighting materials is so strong that a contrary finding would be set aside by us as being so against the weight of the evidence as to be clearly wrong. As a matter of fact, after carefully reading the entire record, we have great difficulty in not believing that appellee, after the cavity was encountered, did not deliberately pursue a course of conduct calculated to prevent appellant from drilling 96 additional feet and completing his contract.

The judgment of the trial court is reversed and the cause is remanded.

Reversed and remanded.